# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) 3:14-CV-00142 JWS |
| vs. | ) ORDER AND OPINION |
| | ) [Re: Motion at docket 43] |
| NORTH MAIL, INC., GEORGE O'BRIEN, COLLEEN VAN VLEET, and THE MUNICIPALITY OF ANCHORAGE, | ) |
| Defendants. | ) |

## I. MOTION PRESENTED

At docket 43, Plaintiff United States of America (the "Government") moved for summary judgment against George O'Brien ("George") and Colleen Van Vleet ("Colleen"; collectively, "Defendants") pursuant to rule 56 of the Federal Rules of Civil Procedure. Specifically, the Government seeks an order setting aside the transfer of the subject property owned by Defendants and directing that the proceeds from the sale of the property are distributed to the Government in partial satisfaction of Defendant

North Mail, Inc.'s ("North Mail") unpaid tax liabilities.[1] Defendants oppose at docket 49. The Government replies at docket 53. Oral argument was not requested and would not be of assistance to the court.

## II. BACKGROUND

North Mail operated as a mailing service provider, maintaining contracts with large organizations that had high-volume mailing requirements and also franchise agreements with two companies that provided mailing supplies to other companies. It was started by Kenneth O'Brien, who had three children: Dennis O'Brien ("Dennis") and Defendants, George and Colleen. Kenneth O'Brien combined North Mail with a similar business owned by Dennis and thereby Dennis obtained a 49% interest in North Mail with Kenneth retaining a 51% interest. When Kenneth retired he divided his shares equally between his three children; Dennis ended up with about two-thirds of North Mail shares while George and Colleen each owned about 17%.

In 1998 North Mail purchased a property located at 5720 B Street in Anchorage, Alaska (the "Property"). On May 26, 2011, North Mail transferred the Property to its minority shareholders, George and Colleen. In exchange for the Property, George and Colleen relinquished their shares to Dennis and North Mail, and they agreed to drop a lawsuit that they had filed against Dennis regarding his mismanagement of North Mail. North Mail leased the Property back from George and Colleen for $6,000 a month and also agreed to be responsible for an IRS lien and a Municipality of Anchorage lien that were recorded against the property. North Mail never paid the rent and was evicted from the Property. It ceased operations in September of 2011 with unpaid employment and income tax liabilities totaling more than $9 million. The Government now seeks to invalidate the transfer of the Property to George and Colleen as a fraudulent conveyance so that all the proceeds of the subsequent sale of the Property, $436,654, can be used in partial satisfaction of the judgment against North Mail. In a related but

---

[1]The court previously entered default judgment against North Mail, Inc. at docket 33.

separate argument, the Government also asserts that two other tax liens totaling a little over $250,000 were assessed prior to the Property transfer, and while the liens were not recorded, the Government argues they should nonetheless have priority over Defendants' interest in the Property because Defendants cannot be considered valid "purchasers" under the applicable statute due to a lack of adequate consideration.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[3] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[5]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[6] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[7] Once the moving party has met this burden, the nonmoving party

---

[2] Fed. R. Civ. P. 56(a).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4] *Id.*

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[6] *Id.* at 323.

[7] *Id.* at 323-25.

-3-

must set forth evidence of specific facts showing the existence of a genuine issue for trial.[8] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[9] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[10]

## IV. DISCUSSION

Defendants do not dispute that North Mail was having financial problems in late 2010. They knew that North Mail had quit paying a monthly retirement payment owed to Kenneth O'Brien and that some employees' paychecks had bounced. They also knew in November of 2010 that there was an IRS investigation regarding unpaid employment taxes. They assert that Dennis prevented them from inquiring into the business's financial status. Colleen independently obtained the company's bank statements and learned that Dennis had been diverting North Mail's income for his personal use. Colleen and George hired a lawyer and began discussing possible settlements and strategies for getting North Mail back on track. Defendants assert that they believed North Mail should be profitable because of its long-term contracts. Defendants state that Dennis failed to cooperate, and therefore, they filed a lawsuit against him in May of 2011 regarding his diversion of North Mail funds and other corporate malfeasance.

On May 26, 2011, Dennis agreed to a settlement whereby the Property, worth about $500,000, would be transferred to Defendants. The consideration for the Property was stated to be Defendants' surrender of their one-third ownership in North

---

[8]*Anderson,* 477 U.S. at 248-49.

[9]*Id.* at 255.

[10]*Id.* at 248-49.

-4-

Mail, which then gave Dennis sole control of the business, and the release of all claims arising out of Dennis's mismanagement of the company. Based upon a 1999 shareholders agreement which valued the company at $1.5 million, Defendants believed that their portion of the business was worth $500,000, or $250,000 each.

At the time of the transfer there were two recorded liens on the Property: 1) one in favor of the Municipality of Anchorage for unpaid property taxes; and 2) the other one in favor of the IRS for unpaid FICA employment taxes for the tax period September 30, 2010, which was assessed on January 31, 2011, and recorded against the Property on February 28, 2011. Defendants were aware of these two liens and acknowledged that the Property was subject to these liens when they obtained the Property from North Mail, but as part of the settlement agreement with Dennis, North Mail and Dennis remained responsible for paying the debt. It is also undisputed that on May 9, 2011, the Government made an assessment against North Mail for unpaid FICA employment taxes for the period December 31, 2010, and that on May 16, 2011, it made an assessment against North Mail for unpaid FUTA unemployment taxes for the 2010 tax period.[11] However, federal tax liens based on these assessments were not recorded against the Property. Defendants assert that they did not know about these assessments. After the transfer of the Property, some time in 2013, a federal tax lien for millions of dollars was levied against North Mail based on unpaid income tax for the years 2007, 2008, and 2009.

**A.      Priority of liens**

If a taxpayer has failed to pay a tax after demand for payment, then a federal tax lien arises at the time of the assessment and attaches to all property and rights to property of the taxpayer on the date of the assessment.[12] When a state-law claim and

---

[11]As of March 13, 2015, the amounts due on these two assessments were $142,345.34 and $111,039.36, respectively.

[12]26 U.S.C. §§ 6321, 6322.

-5-

a federal tax lien compete for priority, federal law controls, and federal law follows the principle that first in time is first in right.[13] There are exceptions. A federal tax lien is not valid against any purchaser until notice of the lien is duly recorded.[14] A purchaser is defined as "a person who, for adequate and full consideration in money or money's worth, acquires an interest . . . in property which is valid under local law against subsequent purchasers without actual notice."[15] "[T]he term 'adequate and full consideration in money or money's worth' means a consideration in money or money's worth having a reasonable relationship to the true value of the interest in property acquired."[16]

Here, there was one IRS lien recorded against the Property at the time of the transfer, and there is no dispute that this recorded lien takes priority over Defendants' interest in the Property. The amount of liability associated with that lien as of March 31, 2015, is $61,878.11. The Government argues, however, that the assessment made against North Mail on May 9, 2011, and the assessment made against North Mail on May 16, 2011—both arising before the transfer of the Property to Defendants—created liens on the Property as of the date of assessment pursuant to federal law and that these two liens, while not recorded, also take priority over Defendants' interest in the Property because Defendants did not provide adequate consideration for the Property to be considered valid purchasers who would be exempt from the federal lien.

As noted above, the stated consideration for the Property was relinquishment of Defendants' shares in North Mail, which Defendants valued at $500,000 total ($250,000 for each of their one-third ownership interest), and their claims against Dennis for his

---

[13] *See Quality Loan Serv. Corp. v. 24702 Pallas Way*, 635 F.3d 1128, 1134 (9th Cir. 2011).

[14] 26 U.S.C. § 6323(a).

[15] 26 U.S.C. § 6323(h)(6).

[16] 26 C.F.R. § 301.6323(h)-1(f)(3).

corporate malfeasance in relation to North Mail. However, this consideration flows to Dennis and not North Mail. North Mail was the entity that owned the building, not Dennis. Therefore, North Mail received nothing of value in exchange for the Property. As stated by the Government:

> Before the transfer North Mail owned a piece of property and had two owners and shareholders who could bring an action against Dennis O'Brien for his harm to it. After the transfer North Mail no longer owned the subject property, no longer had owners and shareholders who could bring an action against Dennis O'Brien, and was actually required to pay $6,000 in monthly rent to continue using the property that it had previously used for free, and also to pay off the tax lien associated with property that it no longer owned.[17]

Without providing "adequate and full" consideration to North Mail, Defendants cannot be considered "purchasers" under §6323 and therefore are not entitled to be exempted from the federal tax liens which arose before the date of transfer and therefore take priority over Defendants' interest. That is, under federal law the federal tax assessments against North Mail created liens against all North Mail property on the dates they were assessed, and even though two of the liens were not recorded against the Property, they nonetheless take priority over Defendants' interest because they were first in time and Defendants were not actually purchasers as defined by statute.

In their response brief Defendants argue that adequate consideration was provided to North Mail because North Mail was listed as a purchaser of their shares under the purchase agreement. Even if North Mail itself was actually the holder of Defendants' shares after the transfer, which has not been shown, the only benefit of such an arrangement nonetheless flows to the remaining shareholder, Dennis, because it simply increases the value of his remaining shares. Defendants also assert in their response brief that part of the consideration for the transfer was that North Mail was released from the obligation to provide life insurance for them. A 1999 shareholders' agreement indeed required North Mail to buy life insurance on the lives of each shareholder sufficient to pay for the entire value of the shares of the respective

---

[17]Doc. 43 at p. 11.

shareholder upon his or her death. Defendants argue that when they gave up their shares in exchange for the Property, North Mail was relieved of that financial obligation. The court is not convinced that the release from that type of contractual obligation could be deemed consideration since North Mail no longer had such an obligation once Defendants gave up their shares to Dennis. Regardless, even if the release of such an obligation could be consideration, it was not full and adequate consideration for the Property. Defendants argue that under Alaska law, consideration should be considered adequate as long as the disparity between the true value of the property and the price paid is not so great so as to "shock the conscience."[18] However, in this situation, what is meant by adequate and full consideration in the statute is defined by federal regulation, and federal regulation requires that there be a reasonable relationship between the value and the price paid.[19] There is nothing in the record to show that North Mail had actually purchased the required insurance and how much that insurance would cost. That is, Defendants have not quantified the value. As the Government points out in its reply brief, the cost of two life insurance policies in the amount of $250,000 would likely be minimal in comparison to the value of the Property.[20]

Finally, Defendants argue that the transfer provided consideration to North Mail because it enabled the company to continue its corporate existence. That is, had they pursued their claims against Dennis for corporate malfeasance North Mail would have had to liquidate its assets. The court agrees with the Government that removing the threat of liquidation is not a tangible benefit that can be construed as legal consideration.[21]

---

[18]Doc. 49 at p. 9 (citing *Blumenstein v. Phillips Ins. Center, Inc.*, 490 P.2d 1213 (Alaska 1971)).

[19]26 C.F.R. § 301.6323(h)-1(f)(3).

[20]*See* doc. 53 at p. 5 n. 3.

[21]*See* doc. 53 at pp. 5-6.

-8-

Without sufficient consideration exchanged, Defendants cannot be considered purchasers under § 6323. Therefore, the assessments made on May 9 and May 16 against North Mail created liens against the Property that take priority over Defendants' subsequently acquired interest. As a result, of the $436,654 in proceeds received from the later sale of the Property, some of that amount should be used to pay North Mail's employment tax liabilities for tax period December 31, 2010 (which was assessed on May 9, 2011) and its unemployment tax liabilities for tax period 2010 (which was assessed on May 16, 2011). As of March 13, 2015, these two liens totaled $253,384.70.

**B. Fraudulent Transfer**

The Government argues that all of the proceeds from the subsequent sale of the Property, not just the portion needed to pay back the liens with priority, should be turned over to the Government in order to partially satisfy the tax liens resulting from North Mail's unpaid income taxes for years 2007, 2008, and 2009. While these income tax assessments were made after the transfer of the Property from North Mail to Defendants, the Government contends that the transfer of the Property was fraudulent and thus should be completely set aside so that all $436,654 of the proceeds can be distributed to the Government in partial satisfaction of the judgment against North Mail.

A fraudulent conveyance is one that is intended to "hinder, delay, or defraud creditors."[22] "Existence of fraudulent intent is a question of fact."[23] The fraud need only be proved by preponderance of the evidence, not clear and convincing evidence.[24] It is "often established circumstantially with evidence of the badges of fraud."[25] These badges of fraud typically include:

---

[22] AS § 34.40.010; *Gabaig v. Gabaig*, 717 P.2d 835, 838 (Alaska 1986).

[23] *Gabaig*, 717 P.2d at 838.

[24] *Id.*

[25] *Id.*

(1) inadequate consideration, (2) transfer in anticipation of a pending suit, (3) insolvency of the transferor, (4) failure to record, (5) transfer encompasses substantially all the transferor's property, (6) transferor retains possession of the transferred premises, (7) transfer completely depletes transferor's assets, and (8) relationship of the parties.[26]

Many of the badges of fraud are present here. As discussed above, there was inadequate consideration provided to North Mail. The record also makes clear that North Mail was insolvent at the time of the transfer, if insolvency is reviewed in terms of North Mail's ability to pay its bills when they became due:[27] paychecks were bouncing, North Mail did not pay Kenneth O'Brien the $3,000 a month owed to him, and there were outstanding tax liabilities. Furthermore, it is undisputed that North Mail had no significant assets besides the Property.[28] North Mail retained possession of the premises after the transfer, and the transfer was not an arms-length transaction in that Defendants were partial owners of the transferor.

However, there is a disputed issue of fact as to whether the transfer was done in anticipation of a pending lawsuit. The Government says that Defendants were aware of North Mail's serious tax problems because it sent Defendants a letter on November 10, 2010, notifying them that North Mail had not paid income taxes for the years 2007-2009.[29] However, that letter is not in the record, and Defendants assert that they only knew about some unpaid employment taxes. It is undisputed that Defendants received

---

[26]*Id.*; *see also Shaffer v. Bellows*, 260 P.3d 1064, 1068-69 (Alaska 2011).

[27]*Shaffer*, 260 P.3d at 1069 n.12 (noting that "Black's Law Dictionary defines insolvency as 'being unable to pay debts *as they fall due.*'").

[28]Defendants assert that they believed North Mail had other valuable equipment and assets at the time of the transfer, but nonetheless admit that they were only able to obtain $7,000 from North Mail equipment at a subsequent auction that was conducted in order to collect on the judgment in their eviction action against North Mail when it failed to pay the rent after the transfer.

[29]The Government also asserts that Colleen was aware of income tax problems (Doc. 43 at pp. 5-6, ¶ 14), but the citation to the record is not accurate. The court presumes it was trying to cite to Colleen's deposition testimony, Exhibit LY-2 and not LY-3, but regardless, the pages cited are not included in the record.

a letter about the inquiry into unpaid *employment taxes* at the end of November 2010, but that Colleen was never told how much was owed.[30] Defendants' declarations assert that they were not aware of any federal liabilities except the unpaid unemployment taxes and the one recorded lien related to those taxes and did not know North Mail owed additional taxes until after the transfer.[31] Indeed, because there was only one recorded IRS lien on the Property for unpaid employment taxes and that lien was recorded after Defendants had learned about the IRS inquiry into unpaid employment taxes, drawing all inferences in favor of Defendants, they could have believed that the recorded lien covered all that was owed.

Badges of fraud "must be viewed within the context of each particular case."[32] As the Alaska Supreme Court has said, "the mere presence of these indicia of fraud is in itself insufficient to warrant summary judgment, since the badges are merely evidentiary; they are circumstantial evidence of intent, no more."[33] Defendants maintain that they took ownership of the Property for the purpose of cutting business ties with Dennis and not for the purpose of defrauding the IRS. Before it can be determined whether the conveyance of the Property was a fraudulent transfer, it will be necessary for the trier of fact to determine Defendants' intent.

## V. CONCLUSION

Based on the preceding discussion, the Government's motion for summary judgment at docket 43 is **GRANTED IN PART AND DENIED IN PART**. Part of the

---

[30]Doc. 51 at p.3, ¶ 8.

[31]Doc. 51 at p. 6, ¶ 16; Doc. 50 at p. 4, ¶ 7.

[32]*Shaffer*, 260 P.3d at 1068.

[33]*Lane's Estate v. Lane*, 631 P.2d 103, 106 (Alaska 1981); *see also Sedwick v. Gwinn*, 873 P.2d 528, 866-87 (Wash. Ct. App. 1994) (concluding that the badges of fraud "are only circumstantial evidence of intent, and in cases whether debtor denies that his or her intent was to defraud, the issue cannot be conclusively determined by the trier of fact until it has heard the testimony and assessed the witnesses' credibility.").

$436,654 proceeds from the sale of the Property are to be distributed to the Government in order to pay all sums associated with the tax assessments made prior to the transfer of the Property. The court cannot order the remainder of the proceeds to be distributed to the Government because the issue of whether the transfer of the Property to Defendants was fraudulent cannot be determined through summary judgment on the record provided.

DATED this 28th day of March 2016.

/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE